IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERBE ELECTROMEDIZIN GMBH, et al., )
)
)
Plaintiffs, )
)
-vs- )
Civil Action No. 05-1674
)
CANADY TECHNOLOGY LLC, et al., )
)
)
Defendants. )

AMBROSE, Chief District Judge.

## OPINION and ORDER OF COURT

### SYNOPSIS

Plaintiff, ConMed Corporation ("ConMed"), filed a Motion for Partial Summary Judgment. (Docket No. 114). Plaintiff, ERBE Elektromedizin GmbH and ERBE USA, Inc. (collectively "ERBE"), filed a Motion for Partial Summary Judgment (Docket No. 137). Defendants, Dr. Jerome Canady and Canady Technology LLC, also filed a Motion for Summary Judgment. (Docket No. 182). The briefing regarding the same is finally complete. After careful consideration of the submissions of the parties, ConMed's Motion for Partial Summary Judgment (Docket No. 114) is granted in part and denied in part, ERBE's Motion for Partial Summary Judgment (Docket No. 137) is granted in part and denied in part, and Defendants' Motion for Summary Judgment (Docket No. 182) is granted in part and denied in part.

## I. BACKGROUND

Plaintiff, Erbe Elektromedizin GmbH, manufactures and sells flexible endoscopic probes for argon plasma coagulation ("APC"). ERBE is the owner, by assignment, of Patent No. 5,720,745 ("Patent '745) issued on February 24, 1998, titled "Electrosurgical Unit and Method for Achieving Coagulation of Biological Tissue." It was filed as a continuation-in-part of ERBE's prior Application Serial No. 981,009 ("the '009 application'),[1] and had a six year prosecution history. Plaintiff, Erbe USA, Inc., is a subsidiary of ERBE Elektromedizin GmbH.

ERBE USA is the owner of U.S. Trademark Reg. No. 2,637,630 ("the '630 Registration), registered on the Supplemental Register by the USPTO on October 15, 2002. The '630 Registration is for the color blue as applied to the tube portion of its flexible endoscopic probes for use in argon plasma coagulation ("the Blue Probe Mark"). According to the Amended Complaint, ERBE asserts the following as their trade dress: "a substantially elongated blue tube having a plurality of graduated black markings at the end of the elongated tube. (Docket No. 18, ¶48).

Plaintiff, ConMed Corporation ("Conmed"), is in the business of manufacturing and selling electrosurgical generators and related devices, including argon gas-enhanced electrocoagulation equipment. ConMed is the owner, by assignment, of Patent No. 4,781,175 ("'175 patent"), which was issued on November 1, 1988, titled "Electrosurgical Conductive Gas Stream Technique of Achieving Improved Eschar for

---

[1]The '009 application was filed on November 24, 1992. The '009 application was rejected by the USPTO on August 2, 1993. After losing an appeal of the rejection, ERBE filed the continuation-in-part application on December 28, 1995, that led to the issuance of the '745 patent.

Coagulation." The '175 patent was filed on April 8, 1986, by Francis T. McGreevy, Carol Bertrand, and Karl W. Hahn, and expired on April 8, 2006.

On January 21, 2000, ERBE entered into an agreement with ConMed to license several ConMed patents, including the '175 patent. Under the Agreement, ERBE was licensed to manufacture and sell various argon gas-enhanced electrocoagulation equipment, including electrosurgical generators and flexible probes related to argon gas-enhanced electrocoagulation.

Defendant, Canady Technology, markets and sells single use disposable flexible APC probes that may be connected to an adapter that in turn is connected to an ERBE APC electrosurgical unit. Defendant, Dr. Jerome Canady, is the CEO and partial owner of Canady Technology.

ERBE and ConMed filed an Amended Complaint against Defendants setting forth the following six counts:

> Count I:  Infringement of the '745 Patent
>
> Count II:  Infringement of the '175 Patent
>
> Count III:  Federal Trademark Infringement under the Lanham Act
>
> Count IV: Unfair Competition in Violation of 15 U.S.C. §1125
>
> Count V:  Common Law Infringement and Unfair Competition
>
> Count VI  Passing Off

(Docket No. 18). In response, Defendants answered the Amended Complaint and Defendant, Canady Technologies, filed the following Counterclaims:

<u>First Counterclaim</u>:  Declaratory Judgment of Non-Infringement

<u>Second Counterclaim</u>:  Declaratory Judgment of Invalidity

<u>Third Counterclaim</u>:  Declaratory Judgment of Implied License

<u>Fourth Counterclaim</u>:  Declaratory Judgment of Unenforceability Due to Inequitable Conduct

<u>Fifth Counterclaim</u>:  Agreement in Restraint of Trade/Conspiracy to Monopolize - Violation of §§1 and 2 of The Sherman Act

<u>Six Counterclaim</u>:  Monopolization and Attempted Monopolization Violation of §2 of The Sherman Act

<u>Seventh Counterclaim</u>:  Declaratory Judgment of Unenforceability Due to Patent Misuse

<u>Eighth Counterclaim</u>:  Tortious Interference with a Contract

<u>Ninth Counterclaim</u>:  Tortious Interference with a Business Expectancy

(Docket No. 27).

Pending are the following Motions: 1) ConMed's Motion to Strike Portions of Defendants' Summary Judgment Papers under Rule 56(e) (Docket No. 142); 2) ConMed's Motion for Partial Summary Judgment (Docket No. 114); 3) ERBE's Motion for Partial Summary Judgment (Docket No. 137); and 4) Defendants' Motion for Summary Judgment as to all of Plaintiffs' claims (Docket No. 182).  The parties have all responded and replied to the pending Motions.  Therefore, the issues are now ripe for review.

## II.  <u>LEGAL ANALYSIS</u>

### A.  <u>STANDARD OF REVIEW</u>

Summary judgment may only be granted if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. *Id.* Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex*, 477 U.S. at 322.

Once the moving party satisfies its burden, the burden shifts to the

nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id*. at 324. Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988), *quoting, Celotex*, 477 U.S. at 322. Furthermore, in antitrust litigation, "[t]o survive a motion for summary judgment, an antitrust plaintiff must produce economically plausible evidence supporting the elements of its claim." *Harrison Aire, Inc. v. Aerostar Intern., Inc.,* 423 F.3d 374, 380 (3d Cir. 2005); *citing, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). "If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id., quoting, Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992).

B. <u>CONMED'S MOTION TO STRIKE</u>

ConMed filed a Motion for Summary Judgment. (Docket No. 114). Defendants filed various documents in opposition thereto including, a Memorandum of Law with Exhibit (Docket Nos. 129, 132), a Responsive Statement of Material Facts (Docket No. 131), a declaration of Jerome Canady (Docket No. 133), and a declaration of Lewis Gelbman. (Docket No. 134). ConMed, filed a Motion to Strike Portions of Defendants' Summary Judgment Papers Under Federal Rule of Civil Procedure 56(e). (Docket No. 142). Generally, ConMed is seeking an order striking seventy-seven (77) different

portions of Defendants' opposition papers. *Id.* Defendants have filed a Brief in Opposition to the same. (Docket No. 155).

Rule 56(e) of the Federal Rules of Civil Procedure provides as follows:

> (e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

F.R.C.P. 56(e). Moreover "[a]n affidavit that is 'essentially conclusory' and lacking in specific facts is inadequate…" to defeat a motion for summary judgment. *Mandonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir. 1985), *quoting Drexel Union Prescription Centers, Inc.,* 582 F.2d 781, 789-90 (3d Cir. 1978). *See, Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990); *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir. 1990), *cert. denied,* 502 U.S. 940 (1991). "Legal memoranda and oral argument are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey,* 772 F.2d 1103, 1109-10 (3d Cir. 1985).

ConMed has broken down the specific statements it wishes to have stricken into seven categories: 1) statements in Defendants' Brief and Statement of Facts that are unsupported by any citation; 2) factual assertions regarding the state of mind of another; 3) factual assertions based on hearsay; 4) factual assertions based on conclusory allegations, speculation, and unsubstantiated assertions; 5) improper expert opinion testimony; 6) loose exhibits attached to the brief with no sponsoring testimony; and 7) sham fact issues.  (Docket No. 144, pp. 3-16; *see also*, Docket No. 142, Ex. A).  With regard to the first category, ConMed argues specifically that item numbers 3-5, 7-8, 10-11, 15-16, 18, 20-22, 24-26, 29-34, 36-37, 64, 67, 69, 71 and 75 of Exhibit A (Docket No. 142) should be stricken because they all contain assertions that are unsupported by any citation to admissible proof.  (Docket No. 144, pp. 3-4).  In response, Defendants assert that the statements set forth in item numbers 1-44 and 64-77 are not evidence, but are attorney argument explaining the evidence and reasonable inferences to be drawn therefrom.  (Docket No. 155, p. 3).  Because Defendants concede that these statements are argument and not evidence, I need not accept them as true.  That does not mean, however, that the statements must be stricken from record.  Consequently, ConMed's Motion to Strike is denied in this regard.

With regard to its second argument, ConMed specifically argues that item numbers 15, 19, 20, 22, 43-44, 54-55, and 57-61 of Exhibit A (Docket No. 142) should be stricken because they contain factual assertions regarding the state of mind of another.  (Docket No. 144, pp. 5-6).  In response, Defendants argue that the items

identified relate to Dr. Canady's and Mr. Gelbman's personal knowledge that KLS Martin has refused to supply generators and dual mode probes to Canady Technology and that the statements are admissible to show KLS Martin's reasons for not supplying the generators and dual mode probes. (Docket No. 155, pp. 5-6). I agree with Defendants that item numbers 58 and 59 are admissible to show the state of mind of why KLM Martin no long supplied generators and dual mode probes to Canady Technology. *See, Callahan v. A.E.V., Inc.,* 182 F.3d 237, 241 (3d Cir. 1999) ( "[P]laintiffs themselves can testify that the customers are in fact no longer shopping at their stores. Furthermore, although the reports of the customers' statements are hearsay, they are admissible as evidence of the customers' states of mind, i.e., their reasons for no longer shopping at the plaintiffs' stores."). Moreover, item numbers 57, 60 and 61 may be admissible for other reasons. See, Callahan, 182 F.3d at 253 ("[T]he plaintiffs' own testimony about the actual behavior of their customers is not hearsay. Rather, it is admissible evidence of lost business, although not of the reason therefore. Thus, in the present case, the plaintiffs' testimony that certain customers no longer purchased beer from them, coupled with their testimony concerning the customers' statements of their motive, which is admissible hearsay under Rule 803(3), are together evidence of the fact of damage."). Furthermore, as pointed out earlier, Defendants admit that item numbers 1-44 and 64-77 are attorney argument, and therefore, I need not strike those items. Finally, item number 54 and 55 relate to Dr. Canady's state of mind and should not be stricken. Thus, ConMed's Motion to Strike in this regard is denied and item numbers 15, 19, 20, 22, 43-44, 54-55, 58-59, and

60-61 should not be stricken.

With regard to ConMed's third argument, ConMed summarily submits that item numbers 1, 6, 9, 12-15, 53, and 60-61 should be stricken from the summary judgment papers since they are based on hearsay.  (Docket No. 144, p. 7).  Again, items 1, 6, 9, and 12-15 will not be stricken because they are simply attorney argument.  With regard to item 53, 60 and 61, Defendants argue that they are not being offered for the truth of the matter but rather fall within one of the hearsay exceptions such as an admission against interest.  As set forth above, item numbers 60 and 61 are admissible, not for the truth of the matter, but for other purposes. Item number 53 is admissible for that same reason.  Consequently, ConMed's Motion to Strike in this regard is denied.

With regard to ConMed's fourth argument, ConMed summarily submits that item numbers 2, 4, 7, 9, 14-16, 18-19, 22, 24, 31, 36, 43-44, 47-48, 51-52, 54-55, and 57-62 should be stricken because they are conclusory, speculation, or unsubstantiated assertions.  (Docket No. 144, p. 7-8).  Again, items 2, 4, 7, 9, 14-16, 18-19, 22, 24, 31, 36, and 43-44 will not be stricken because they are simply attorney argument.  With regard to item numbers 47-48, 51-52, 54-55, and 57-62, the statements made therein are based on Mr. Gelbman's and Dr. Canady's knowledge and go to the weight of the evidence.  Therefore, ConMed's Motion to Strike in this regard is denied.

With regard to ConMed's fifth argument, ConMed argues that item numbers 3, 5, 7, 11, 33, 34, 45-48, 52, 63-65, 67, and 75 should be stricken because the statements contain improper expert opinion testimony.  (Docket No. 144, pp. 8-12).

First, ConMed argues that Dr. Canady's testimony regarding the definition of the relevant market should be stricken because the antitrust element requiring the definition of the relevant market requires expert testimony and Dr. Canady was not listed as an expert witness in this case.  (Docket No. 144, pp. 8-9).  As ConMed recognizes in a footnote, however, I have held that "[w]hile it appears as though many parties in antitrust cases utilize expert testimony in order to establish relevant market and market power, we have found no authority which indicates that expert testimony is required, and we do not venture to so hold."  *F.B. Leopold Co., Inc. v. Roberts Filter Mfg. Co., Inc.,* 882 F.Supp. 433, 452 (W.D.Pa. 1995).  Based on the same, I decline to require expert testimony here.

ConMed further argues that if Dr. Canady is attempting to define the relevant market, said testimony is inadmissable because "it is based entirely on unsubstantiated conclusory statements that neither provide probative evidence nor reach the key question of what the relevant customers have come to define as the relevant market."  (Docket No. 144, p. 10).  I disagree.  Dr. Canady sufficiently sets forth his personal knowledge to discuss the interchangeability aspect of the relevant market.  Furthermore, Defendants do not rely solely on Dr. Canady's affidavit to define the relevant market. (Docket No. 155, p. 8-11). Consequently, I will not strike item numbers 3, 5, 7, 11, 33, 34, 64-65, 67, 75 of Defendants' Brief in Opposition / Statement of Facts or item number 63 regarding Dr. Canady's affidavit.

Additionally, ConMed argues that item numbers 45-48 should be stricken because they relate to Mr. Gelbman's expert opinions on how to evaluate

investment in a start-up company, what circumstances are more or less attractive to potential investors, and the causes for the delay in Canady Technology's roll out of new product. (Docket No. 144, p. 12). I disagree that this is expert testimony. To the contrary, Mr. Gelbman was hired by Dr. Canady to assist him in developing a business plan and introducing Dr. Canady to a number of potential investors. (Docket No. 134, ¶2). Consequently, he is permitted to discuss his background and what he did for Canady Technology.

Finally, ConMed argues that item numbers 53-55 should be stricken because they relate to expert opinion of Dr. Canady on what investors in a start-up company view as important. (Docket No. 144, p. 12). I disagree that the statements therein are expert testimony. Furthermore, as I stated previously, these items are admissible for other purposes. Consequently, ConMed's Motion to Strike in this regard is denied.

With regard to ConMed's sixth argument, ConMed argues that the exhibits attached to Defendants' Brief in Opposition should be stricken because the exhibits are not referenced, authenticated, nor explained in either of the declarations filed by Defendants. (Docket No. 144, pp. 13-14). This is not the standard, however. It is well-established in this jurisdiction that the nonmoving party does not have to produce evidence in a form that would be admissible at trial to avoid summary judgment. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir. 1990), *citing Celotex,* 477 U.S. at 324. Instead, the court must be satisfied that the nonmoving party's evidence is capable of being reduced to admissible evidence at

trial.  *J.F. Feeser, Inc.,* 909 F.2d at 1542.  Consequently, ConMed's Motion to Strike is denied in this regard.

With regard to ConMed's seventh argument, ConMed argues that portions of Dr. Canady's affidavit should be stricken because they are a sham.  (Docket No. 144, pp. 14-16).  The "sham affidavit" doctrine is well established in the Third Circuit.  *See, Baer v. Chase,*  392 F.3d 609, 623-26 (3d Cir. 2004).  Under the doctrine, a party may not create a genuine issue of material fact by filing an affidavit contradicting his/her own sworn testimony without offering a plausible explanation for the conflict. *Id., citing Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991).  In such situation, a trial court may disregard the offsetting affidavit.  *Id.*  Nevertheless, just  because there is a discrepancy between deposition testimony and the deponent's later affidavit, the trial court  is not required to disregard the affidavit. *Id.* at 624*, citing Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir.1980).  The Third Circuit has recognized that "there are situations in which sworn testimony can quite properly be corrected by a subsequent affidavit ... [and] [w]here the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact." *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 705 (3d Cir.1988).

Here, the two statements in question by Dr. Canady are not directly in opposition to each other.[2]  To that end, there could be plausible explanations for ConMed's perceived discrepancy.  In fact, in opposition, Dr. Canady states that his

_____

[2]The first statement was made in an affidavit on October 27, 2005, at ¶26.  The second statement was made in an affidavit on April 23, 2007, at ¶14.  (Docket No. 114, p. 15).

April 23, 2007, affidavit was not referring to the January 26, 2005, meeting, but rather to meetings that occurred on April 19-20, 2005 and May 11, 2005, and thus, there is no conflict. (Docket No. 155, p. 12-13). Consequently, I will not disregard the April 23, 2007, affidavit. Therefore, ConMed's Motion to Strike in this regard is denied.

Accordingly, ConMed's Motion to Strike is denied in its entirety.

## C. CONMED'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ConMed is moving for summary judgment as to Canady Technology's antitrust counterclaims (Counterclaims Five and Six), Canady Technology's patent misuse counterclaim (Counterclaim Seven), and Canady Technology's tort counterclaims (Counterclaims Eight and Nine).[3] (Docket No. 114). Specifically, ConMed seeks summary judgment as to Counterclaims Five, Six and Seven[4] under the *Noerr Pennington* doctrine, or alternatively, because Canady Technology allegedly cannot offer admissible evidence creating a jury question as to the essential elements

---

[3]ConMed mistakenly states that the Counterclaims were asserted by both Defendants, when in fact, the Counterclaims were asserted only by Canady Technology. *Compare,* Motion for Partial Summary Judgment (Docket No. 114), *with,* Answer to Amended Complaint and Counterclaims, ¶¶103-216 (Docket No. 27).

[4]Canady Technology's patent misuse counterclaim merely incorporates the paragraphs set forth in its Affirmative Defenses and Counterclaims and then simply concludes that ERBE and ConMed misused the '745 and '175 patents. (Docket No. 27, ¶¶204-05). ConMed argues that the patent misuse counterclaim is nothing more than alleging the "wrongful" enforcement of the patents, to which it is entitled to immunity under the *Noerr-Pennington* doctrine. (Docket No. 120, p. 26). Canady Technology does not address Counterclaim Seven in its Brief in Opposition. (Docket No. 132). After a review of the record, I find there is no genuine issue that Counterclaim Seven is based on the wrongful enforcement of the patents. Therefore, in determining whether ConMed is entitled to summary judgment under the *Noerr-Pennington* doctrine, I will address Counterclaim Seven together with Counterclaim Five. *C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1373 (Fed. Cir. 1998) ("'[W]rongful' enforcement of patents, is activity protected under *Noerr* and *California Motor*, and is not subject to collateral attack as a new ground of 'misuse.'")

under §§1or 2 of the Sherman Act. *Id.* Additionally, ConMed seeks summary judgment as to Counterclaims Eight and Nine because the fraudulent statement attributed to ConMed allegedly was not made, was not fraudulent, and would not be actionable as a matter of law. *Id.*

1. Counterclaim Six

In response to ConMed's Motion for Partial Summary Judgment, Canady Technology submits that "based upon discovery taken in the case" it is no longer pursuing Counterclaim Six against ConMed. (Docket No. 132, pp. 1-2). Consequently, Counterclaim Six is dismissed against ConMed and its Motion for Partial Summary Judgment as to Counterclaim Six is denied as moot.

2. Counterclaim Five and Seven

In this case, Counterclaims Five and Seven are based on the act of ConMed bringing a patent infringement claim against Defendants as a sham. (Docket No. 27, Counterclaims Five and Seven). ConMed first argues that it is entitled to summary judgment as to Counterclaims Five and Seven based on the *Noerr-Pennington* doctrine[5] and because Canady Technology cannot satisfy the "sham" litigation exception. (Docket No. 120, pp. 10-19 and Docket No. 154, pp. 3-4). "Under the *Noerr-Pennington* doctrine, '[a] party who petitions the government for redress generally is immune from antitrust liability.' (Citation omitted). That immunity is so potent that it protects petitioning notwithstanding an improper purpose or motive." *Mariana v. Fisher,* 338 F.3d 189, 198 (3d Cir. 2003), *quoting A.D. Bedell Wholesale Co.,*

---

[5]*See, Eastern R.R. Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127 (1961) and *United Mine Workers of Am. v. Pennington,* 381 U.S. 657 (1965).

*Inc. v. Philip Morris Inc.,* 263 F.3d 239, 250 (3d Cir. 2001), *cert. denied,* 534 U.S. 1081 (2002). "The *Noerr/Pennington* doctrine protects antitrust defendants' rights to 'freely inform the government of their wishes' and 'to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors.'" *Santana Products Inc. v. Bobrick Washroom Equip., Inc.,* 401 F.3d 123, 131 n. 13 (3d Cir. 2005), *quoting Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961).

The immunity under *Noerr-Pennington* doctrine, however, is not unlimited. There is a "sham" litigation exception to the doctrine. *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital,* 185 F.3d 154, 158 (3d Cir. 1999). "Where the challenged private conduct is only 'sham' petitioning - i.e., where it 'is not genuinely aimed at procuring favorable government action as opposed to a valid effort to influence government action" - *NoerrI-Pennington]* immunity is not available. *Id., quoting, Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.,* 508 U.S. 49 (1993)("PRE"). "In essence, sham petitioning entails 'the use of the governmental *process*-as opposed to the *outcome* of that process-as an anticompetitive weapon.'" *Id.* (emphasis in original), *quoting, PRE,* 508 U.S. at 61. *PRE* outlined a two-part test to apply to determine whether a petition is "sham" litigation. *PRE,* 508 U.S. at 60-61.

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception

> must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor, through the use of governmental *process*-as opposed to the *outcome* of that process-as an anticompetitive weapon. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

*Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 122-23 (3d Cir. 1999), *quoting PRE,* 508 U.S. at 60-61(citations omitted).

Canady Technology, however, argues that where the defendant has filed "a whole series of legal proceedings," the test is different. (Docket No. 132, pp. 14-15).

> In cases in which "the defendant is accused of bringing a whole series of legal proceedings," the test is not "retrospective" but "prospective": "Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" Id. As the Ninth Circuit has noted, it is immaterial that some of the claims might, "as a matter of chance," have merit. The relevant issue is whether the legal challenges "are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." Id.

*Primetime 24 Joint Venture v. National Broadcasting, Co., Inc.,* 219 F.3d 92, 101 (2d Cir. 2000), *quoting, USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir.1994). In looking at ConMed solely, and not at ConMed and ERBE jointly as Canady Technology does, I disagree with Canady Technology that *Primetime* applies to ConMed. To begin with, the Counterclaim facts only assert one previous litigation which was brought by ConMed against ERBE.

(Docket No. 27, ¶182). After a review of the record, the exhibits supplied by Canady Technology also reveal one arbitration brought by ConMed against Jerome Canady, M.D. (Docket No. 129-5, Ex. 6). I do not find that this amounts to "simultaneous and voluminous," a "series of," or a "pattern of," legal proceedings. *See, Marchon Eyewear, Inc. v. Tura LP*, 2002 WL 31253199, *9 (E.D.N.Y. 2002) (two other lawsuits did not amount to a "pattern" or "a whole series of legal proceedings"); *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.,* 192 F.Supp.2d 519, 539 (M.D.La.,2001)(presumably four lawsuits not enough, but nine lawsuits were enough); *See Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir.1996); *See also Applera Corp. v. MJ Research, Inc* ., 303 F.Supp.2d 130, 133-34 (D.Conn. 2004)(explaining context of Primetime, as involving " 'huge volumes' of legal challenges," referred to as "automatic petitioning")(quoting Primetime, 219 F.3d at 95-96, 101); *In re Fresh Del Monte Pineapple,* 2007 WL 64189, *17 n. 19 (S.D.N.Y. January 4, 2007). Consequently, I find that Canady Technology must meet the two part test set forth in *PRE.*

Thus, I must first determine if the filing against Defendants is "objectively baseless." If it is not objectively baseless, then the filing of the lawsuit was not a sham and ConMed is entitled to immunity under the *Noerr-Pennington* doctrine. *PRE,* 508 U.S. at 60-61. Canady Technology, argues that patent infringement claim by ConMed is objectively baseless because the '175 Patent and the '745 Patents are diametrically opposed and therefore it is impossible to infringe on both Patents at the same time. (Docket No. 132, pp. 16-18). When considering this Motion brought by ConMed, I am only concerned with ConMed's claim of infringement of the '175

Patent.  ConMed does not have any claims regarding the '745 Patent.  *See,* Amended Complaint (Docket No. 18).  Therefore, I find this argument lacks merit.

Canady Technology also argues in one paragraph that the patent infringement claim by ConMed is objectively baseless due to the doctrine of patent exhaustion.  (Docket No. 132, pp. 21-22).  "The first sale/patent exhaustion doctrine establishes that the unrestricted first sale by a patentee of his patented article exhausts his patent rights in the article."  *Monsanto Co. v. Scruggs,* 459 F.3d 1328, 1336 (Fed. Cir. 2006), *citing Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 701 (Fed. Cir. 1992); and *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006).  I find that Canady Technology's one paragraph argument fails to adequately address the issues germane to such a discussion and  how the application of the patent exhaustion doctrine would destroy the application of the *Noerr-Pennington* immunity as it applies to ConMed.  Consequently, I find no merit to this argument either.

Finally, Canady Technology argues that ConMed's "attempts to characterize its settlement and license agreement with ERBE as a 'successful' enforcement action," as a means to justify its suit filed against it, is irrelevant to the issue of whether ConMed's infringement claim is objectively baseless.  (Docket No. 132, p. 19).  Even assuming this to be true, it does not mean that there are not other reasons upon which the claim was objectively based.  After a review of the evidence, I find there was probable cause to bring the claim.  *See,* Jonas Decl. and Exs. (Docket No. 124).  Thus, I find that Count II of the Amended Complaint (Docket No. 18) regarding

the '175 Patent, is not objectively baseless.

Therfefore, I find that Canady Technology's sham exception argument fails to defeat the application of the *Noerr-Pennington* doctrine as it relates to ConMed. Consequently, ConMed is entitled to summary judgment as to the antitrust and patent misuse Counterclaims.[6]

3. Counterclaims Eight and Nine

Next, ConMed argues that it is entitled to summary judgment as to Counterclaims Eight and Nine because Canady Technology failed to establish its tortious interference claims. (Docket No. 120, pp. 26-29; Docket No. 154, pp. 4-5). To assert a cause of action for intentional interference with a contractual relation, whether existing or prospective, under Pennsylvania law, the moving part must prove:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
>
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual legal damage as a result of the defendant's conduct."

---

[6]Since I have not found that the challenged litigation is objectively baseless, I may not consider the second prong of the sham litigation exception, the litigant's subjective motive. *Cheminor Drugs, Ltd.,* 168 F.3d at 122-23, *quoting PRE,* 508 U.S. at 60-61("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."). Additionally, based on this finding, I need not consider ConMed's alternative arguments regarding Counterclaims Five and Seven. *See,* ConMed's Brief in Support (Docket No. 120, pp. 17-25).

*Crivelli v. General Motors Corp.,* 215 F.3d 386, 394-95 (3d Cir. 2000), *citing, Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa.Super. 1997). ConMed only argues that Canady Technology cannot prove the first two elements. (Docket No. 120, p. 27).

With regard to the first element, Canady Technology alleges in its Amended Complaint that it had a binding contract with KLS Martin for the supply of APC generators for distribution in the United States and based on a Letter of Intent from KLS Martin, it has a reasonably certain business expectation. (Docket No. 27, ¶¶207, 213). To that end, Canady Technology has only come forward with a Letter of Intent. (Docket No. 132, Ex. 10). Thus, there is no evidence of an existing contract with KLS Martin. Consequently, ConMed is entitled to summary judgment as to Counterclaim Eight.

There is, however, evidence of a prospective contractual relation. (Docket No. 132, Ex. 10). As a result, I will consider whether there is a genuine issue of material fact with regard to the second element for Counterclaim Nine. ConMed argues that there is no evidence of a purposeful action on its part to prevent a prospective relation from occurring. (Docket No. 120, pp. 27-29). After a review of the record, I disagree. The letter authored by Joseph Corasanti, President and CEO of ConMed, dated May 27, 2005, was a letter sent to Dr. Canady regarding "Amendments to License and Supply Agreements." *See,* Jonas Decl. at Ex. O (Docket No. 124, Ex. O). This letter was sent not only to Dr. Canady, but to Michael Martin of KLS Martin. Viewing this letter in the light most favorable to the non-moving party, Canady

Technology, I find there is a genuine issue of material fact as to the second element. As a result, ConMed's Motion for Summary Judgment as to Counterclaim Nine is denied.

D. ERBE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ERBE is moving for summary judgment as to Canady Technology's inequitable conduct counterclaim (Counterclaim Four), patent misuse counterclaim (Counterclaim Seven), and the antitrust counterclaims (Counterclaims Five and Six). (Docket No. 137).

1. Counterclaim Four - Inequitable Conduct

Counterclaim Four asserts a cause of action for inequitable conduct. (Docket No. 27). ERBE argues that it is entitled to summary judgment as to Counterclaim Four because Canady Technology cannot establish any inequitable conduct. (Docket No. 149, pp. 14-19). Applicants for patents and their representatives are required to prosecute applications in the PTO with candor, good faith, and honesty. *Molins PLC v. Textron*, 48 F.3d 1172, 1178 (Fed. Cir. 1995), *citing Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 818 (1945). A breach of this duty constitutes inequitable conduct. *Molins, supra*. As the Federal Circuit Court of Appeals has summarized:

> Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. Determination of inequitable conduct requires a two-step analysis. First, the trial court must determine whether the conduct meets a threshold level of materiality. The trial court must then also determine whether the evidence

> shows a threshold level of intent to mislead the PTO. . . .
> Once the threshold levels of materiality and intent have
> been established, the trial court is required to weigh
> them. In light of all the circumstances, the court must
> then determine whether the applicant's conduct is so
> culpable that the patent should be held unenforceable.

*Bd. of Educ. ex rel. Bd. of Tr. of FSU v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1343 (Fed. Cir. 2003) (internal citations omitted).

Information is material "if there is a 'substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent.' " *Honeywell Intern. Inc. v. Universal Avionics Systems Corp.*, 488 F.3d 982, 1000 (Fed. Cir. 2007), *quoting*, *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1440 (Fed. Cir.1991) *quoting*, 37 C.F.R. § 1.56 (1989). Intent means the "design, resolve, or determination with which a person acts; a state of mind in which a person seeks to accomplish a given result through a course of action." *Molins*, 48 F.3d at 1180. That does not mean that the party alleging inequitable conduct must come forward with "smoking gun" evidence. *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989) ("Intent need not, and rarely can, be proven by direct evidence."). Rather, intent to deceive may be inferred from the facts and circumstances surrounding the applicant's overall conduct. *Id*. (Intent "is most often proven by a showing of acts the natural consequences of which are presumably intended by the actor.")

Inequitable conduct is a question of equity to be decided by the court. *Paragon Podiatry Lab. v. KLM Labs*, 984 F.2d 1182, 1190 (Fed. Cir. 1993). A party alleging inequitable conduct as a defense must prove the threshold elements of materiality

and intent by clear and convincing evidence. *Abbott Labs v. Torpharm, Inc.*, 300 F.3d 1367, 1380 (Fed. Cir. 2002). While generally, "precedent urges caution in the grant of summary judgment respecting a defense of inequitable conduct, summary judgment is not foreclosed." *Paragon Podiatry*, 984 F.2d at 1190. "[A] motion for summary judgment may be granted when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant can not prevail." *Abbott Labs*, 300 F.3d at 1379, *citing ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 547 (Fed. Cir. 1998).

In this case, ERBE specifically argues that there is no evidence of a misrepresentation or omission, that its conduct was immaterial, and there was no evidence of intent with regard to the alleged misrepresentations cited to by Canady Technology in its Answer to Amended Complaint and Counterclaims. (Docket No. 149, pp. 14-19, *citing* Docket No. 27, ¶¶ 62-76).[7] In response, Canady Technology does not address these alleged misrepresentations. (Docket No. 165, p. 23). Rather, it appears from its Brief that the inequitable conduct complained about now by Canady Technology is that "the inventors of the '745 patent and the patent attorneys failed to disclose to the USPTO material information relating to laparoscopic use of argon plasma coagulation prior to 1992." (Docket No. 165, p. 23).

As pointed out by Canady Technology, in 1985, ERBE became a distributor for a company called "Beacon." (Docket No. 167, p. 19). The Beacon products dealt with

---

[7]In addition, Canady Technology asserts other statements were material misrepresentations with the intent to deceive. (Docket No. 27, ¶¶70-76). These statements have nothing to do with laparoscopy. *Id.*

by ERBE included Beamer One and Beamer Two.  *Id.* at 20.  These were argon gas sources with controlled elements for the flow rates.  *Id.*  Additionally, ERBE distributed electrosurgical pencils, laparoscopic probes and one other instrument. *Id.* at 20-21.  ERBE's work on its own argon gas-assisted coagulation equipment or apparatus did not begin until 1993. *Id.* at 25.  According to Canady Technology, "[t]he laparoscopic probes distributed by ERBE unquestionably constituted prior art to the '745 patent and its parent '009 application[8] yet were never disclosed to the USPTO during the prosecution."  (Docket No. 165, p. 23).

ERBE's only argument in opposition is that the information was immaterial because it was cumulative.  (Docket No. 187, p. 6).  Specifically, ERBE argues that "[t]he use of laparoscopy was disclosed to the Examiner" in the article <u>Technology of Argon Plasma Coagulation with Particular Regard to Endoscopic Applications</u> and in U.S. Patent No. 4,753,223 ("the '223 Patent), which appear on the face of the '745 Patent. (Docket No. 187, p. 6).  While I agree that cumulative information is not material, *Honeywell Intern. Inc.*, 488 F.3d. at 1000, I do not find this information to be cumulative.

To begin with, the reference to the '223 Patent on the face of the '745 Patent refers to "Bremer" and not Beamer.  I have no evidence regarding the '223 Patent, let alone that it states anything about prior laparoscopic art.  Consequently, the reference of the '223 Patent does not support ERBE cumulative argument.

Furthermore, the above referenced article merely references laparoscopy in

_____

[8]The '009 application was filed on November 24, 1992.  (Docket No. 179-4, Ex. 3).

one sentence: "Applicators for laparoscopy are designed so as to facilitate their application via trocar sleeves (Figure 9)." (Docket No. 138-38, Ex. 30, p. 34). Based on the same, I do not find the information discussed by Canady Technology to be cumulative of other information already before the Patent Office.

Therefore, after a review of the evidence set forth above, I find that Canady Technology had met its burden of showing a genuine issue regarding inequitable conduct. Consequently, summary judgment as to Counterclaim four is not warranted.

## 2. Counterclaims Five and Six

Counterclaims Five and Six are based on the act of ERBE bringing a patent infringement claim against Defendants as a sham. (Docket No. 27, Counterclaims Five and Six). ERBE argues that it is entitled to summary judgment as to Counterclaims Five and Six based on the *Noerr-Pennington* doctrine and because Canady Technology cannot satisfy the "sham" litigation exception.[9] (Docket No. 137 and Docket No. 149, pp. 19-20, 24-28). The standard for the *Noerr-Pennington* doctrine is set forth above.

The exception to the *Noerr-Pennington* doctrine relied upon by Canady Technologies is the "sham litigation" exception. (Docket No. 165, p. 5). As set forth above, *PRE* outlined a two-part test to apply to determine whether a petition is

---

[9]ERBE also asserts that Canady Technology cannot prove the other exception to *Noerr-Pennington* immunity. (Docket No. 137 and Docket No. 149, pp. 20-24). This exception is called the *Walker Process* fraud exception. *See, Walker Process Equip., Inc. v. Food Mach. & Chem., Corp.,* 382 U.S. 172, (1965). Canady Technology, however, does not base its Counterclaims upon the *Walker Process* fraud exception. (Docket No. 165, p. 5). Therefore, I need not consider this exception.

"sham" litigation.  *PRE,* 508 U.S. at 60-61. First, the lawsuit must be objectively baseless.  *Id.*  If, and only if the lawsuit is objectively baseless, then the court may examine the litigant's subjective motivation.  *Id.*

Canady Technology, however, argues that where the defendant has filed "a whole series of legal proceedings," the test is different.  (Docket No. 132, pp. 14-15).

> In cases in which "the defendant is accused of bringing a whole series of legal proceedings," the test is not "retrospective" but "prospective": "Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?"  As the Ninth Circuit has noted, it is immaterial that some of the claims might, "as a matter of chance," have merit. The relevant issue is whether the legal challenges "are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."

*Primetime 24 Joint Venture v. National Broadcasting, Co., Inc.,* 219 F.3d 92, 101 (2d Cir. 2000), *quoting, USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council, AFL-CIO,* 31 F.3d 800, 811 (9th Cir.1994).  In looking at ERBE solely, and not at ConMed and ERBE jointly as Canady Technology does, I disagree with Canady Technology that *Primetime* applies to ERBE.        Canady Technology asserts that ERBE has brought four separate litigations against Defendants.[10]  (Docket No. 165, p. 8).   ERBE does not dispute that there are four lawsuits.  (Docket No. 187, pp. 3-5; Docket No. 149, pp. 29-33).  While I do not attempt to set forth the exact number of

---

[10]Canady Technology specifically asserts that "ConMed and ERBE have brought against Canady Technology and its CEO, Dr. Canady, four separate lawsuits and an arbitration."  (Docket No. 165, p. 8). As set forth above, the record reveals that the arbitration was brought only by ConMed against Dr. Canady.  (Docket No. 129-5, Ex. 6).  As a result, I only consider the four lawsuits.

litigations necessary to fall within the *Primetime* standard, I do not find that four lawsuits amount to "simultaneous and voluminous," a "series of," or a "pattern of," legal proceedings. *See, Marchon Eyewear, Inc. v. Tura LP*, 2002 WL 31253199, *9 (E.D.N.Y. 2002) (two other lawsuits did not amount to a "pattern" or "a whole series of legal proceedings"); *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*, 192 F.Supp.2d 519, 539 (M.D.La.,2001)(presumably four lawsuits not enough, but nine lawsuits were enough); *See Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir.1996); *See also Applera Corp. v. MJ Research, Inc* ., 303 F.Supp.2d 130, 133-34 (D.Conn. 2004)(explaining context of *Primetime*, as involving " 'huge volumes' of legal challenges," referred to as "automatic petitioning")(*quoting Primetime*, 219 F.3d at 95-96, 101). Consequently, I find that Canady Technology must meet the two part test set forth in PRE.

Thus, I must now determine whether ERBE's lawsuit against Defendants is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *PRE,* 508 U.S. at 60; *Cheminor Drugs, Ltd.,* 168 F.3d at 122. "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." *PRE,* 508 U.S. at 62. "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication...the existence of probable cause is an absolute defense." *Id.* at 62-62.

Canady Technology asserts that ERBE's trademark and trade dress claims are objectively baseless. (Docket No. 165, pp. 8-9). As support for this position, Canady

Technology makes a number of conclusory statements without any references to the record or supportive case law. *Id.* Moreover, the case law cited to by Canady Technology does not suggest that ERBE did not have "probable cause to institute" the case, which is the test to be applied. Consequently, I find that Canady Technology has failed to show, based on the evidence, that ERBE's trademark and trade dress claims are "objectively baseless." *PRE,* 508 U.S. at 60; *Cheminor Drugs, Ltd.,* 168 F.3d at 122.

Next, Canady Technology argues that the patent infringement claims were objectively baseless. (Docket No. 165, pp. 9-13). Canady Technology sets forth three arguments as to why ERBE's patent infringement claims were objectively baseless: 1) since there is no direct infringement, there can be no indirect infringement; 2) the '745 Patent and the '175 Patent are diametrically opposed so it cannot be infringing on both; and 3) ERBE litigated the same claims against ConMed in another lawsuit and lost the case on summary judgment. (Docket No. 165, pp. 9-13). I will address each of these arguments.

ERBE's patent claims are for indirect infringement. (Amended Complaint, Docket No. 18, Counts I and II). There can be no indirect infringement without direct infringement. *See,* 35 U.S.C. §271(c);[11] *Argo Mfg. Co. v. Convertible Top Replacement*

---

[11]35 U.S.C.A. § 271(c) provides as follows:

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

*Co.,* 365 U.S. 336, 341 (1961) ("[I]t is settled that if there is no direct infringement of a patent there can be no contributory infringement.").  Along those lines, Canady Technology's first argument is that ERBE's patent claims are objectively baseless because there is no direct infringement.  In support of this conclusion, Canady Technology argues that "ERBE's and ConMed's entire argument is that the accused Canady Technology probes are unpatented components of the larger patented systems (APC units, generators, etc) sold by ERBE."  (Docket No. 165, p. 11).  It continues that purchasers of an ERBE system have an implied license to use and to repair the system it purchased.  (Docket No. 165, p. 11).  Because the probes are single use disposable items, or "spent" parts, Canady Technology argues that the probe may permissibly be replaced by the user.  *Id.*  Therefore, it concludes that there can be no direct act of infringement of either patent.  *Id.*

"A patentee grants an implied license [for the life of an article][12] to a purchaser when (1) the patentee sells an article that has no noninfringing uses and (2) the circumstances of the sale plainly indicate that the grant of a license should be inferred." *Anton/Bauer, Inc. v. PAG, LTD.,* 329 F.3d 1343 (Fed. Cir. 2003), *citing, Met-Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 686 (Fed. Cir. 1986).  Once a purchaser has an implied license, the purchaser may then repair it with replacement parts from others under the doctrine of repair and continue to use the article in the patented combination without infringing upon the patent.  *The Kendall Co. v.*

---

[12] "[A]n implied license arising from sale of a component to be used in a patented combination extends only for the life of the component whose sale and purchase created the license." *Carborundum Co. v. Molten Metal Equipment Innovations, Inc.,* 72 F.3d 872, 879 (Fed. Cir. 1995).

*Progressive Med. Tech.,* 85 F.3d 1570, 1573-74 (Fed. Cir. 1996). In such a case, direct infringement can only occur when there is a complete reconstruction of the device. *Id.* at 1574.

> [T]he terms "repair" and "reconstruction" are used to define the boundary between permitted and prohibited activities with respect to patented items after they have been placed in commerce. Originating in the principle of exhaustion of the patent right after first sale, the general rule is that "while the ownership of a patented article does not include the right to recreate a substantially new article, it does include the right to preserve the useful life of the original article." Precedent has elaborated on the right of the owner to replace unpateneted components, provided that the activity is not such as to make a new article. In *Aro Manuf. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, (1961) the Court stated the controlling inquiry governing the replacement of unpatented parts of a patented article:
>
> > reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to "in fact make a new article," after the entity, viewed as a whole, has become spent....Mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property. *Id.* at 364.

*Id.* (Citations omitted).

Thus, to begin with, the articles sold must have no noninfringing uses. *Anton/Bauer, Inc. v. PAG, LTD.,* 329 F.3d 1343 (Fed. Cir. 2003). In this case, I find that Canady Technology has failed to demonstrate that the articles sold have no noninfringing uses. (Docket No. 165, pp. 9-11). Consequently, I find that Canady

Technology has not met its burden under this argument.

With regard to Canady Technology's second argument, even assuming that both patents are diametrically opposed, there is evidence that some of its probes could potentially function at flow rates as low as 0.1 l/min for the 1.5 mm Canady probe, 0.5 l/min for the 2.3 mm Canady probe, and 0.6 l/min for the Canady 3.2 mm probe. ERBE Ex. 13, Summary (Docket No. 138-18, p. 20). Therefore, I do not find ERBE's claims to be objectively baseless in this regard.

With regard to its third argument, I agree with Canady Technology that ERBE cannot put its head in the sand and play dumb even though the opinion was vacated.[13] This does not mean, however, that ERBE did not have an objective basis for filing its patent claims against Canady Technology. The claims in this case are not exactly the same. Consequently, I find that Canady Technology has failed to meet its burden of showing that the patent claims are objectively baseless. Consequently, I find that Canady Technology has failed to demonstrate that ERBE's patent infringement claims were objectively baseless. Therefore, ERBE is entitled to *Noerr-Pennington* immunity with regard to its patent infringement claims and, thus, entitled to summary judgment as to Counterclaims Five and Six.

3. Counterclaim Seven

Canady Technology's seventh Counterclaim is one of patent misuse. (Docket No. 27). Like the antitrust counterclaims, ERBE argues, *inter alia,* that Canady

---

[13]ERBE attempts to disown the findings within the vacated summary judgment opinion by the U.S. District Court for the Northern District of New York at 00-CV-0987 as set forth at Docket No. 163-11 (Ex. LL), while in the same brief attempts to use those portions it believes are helpful. *Compare,* Docket No. 149, p. 25 with p. 19. ERBE cannot have it both ways.

Technology's patent misuse counterclaim is based on sham litigation. (Docket No. 149, pp. 37-39). In response, Canady Technology merely states one sentence: "For the reasons stated above with respect to Defendants' antitrust claims, ERBE (sic) frivolous enforcement actions constitute patent misuse and render the '745 patent unenforceable." (Docket No. 165, p. 24). Consequently, Canady Technology has failed to present any argument as to why ERBE is not entitled to *Noerr-Pennington* immunity for its patent misuse counterclaim. As a result, Canady Technology has not met its burden. Therefore, I find that ERBE is entitled to *Noerr-Pennington* immunity with regard to Counterclaim Seven and, thus, summary judgment in favor of ERBE is warranted as to Counterclaim Seven.

E. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, both Dr. Canady and Canady Technology, move for summary judgment as to "all of Plaintiffs' claims." (Docket No. 182). As set forth above, there are six (6) counts to Plaintiffs' Amended Complaint. (Docket No. 18). I will begin with the patent infringement claims (Counts I and II).

1. Patent Infringement Claims - Counts I and II

There is a two-part test to be applied in all patent infringement claims. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004). First, a court must engage in a claims construction. *Id., citing, Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998)(*en banc).* Then, a court must compare the properly construed claims to the allegedly infringing device. *Id.* I have previously construed the claims. (Docket No. 112). Therefore, I must now engage in the second

part of the two-part test.

Plaintiffs have brought indirect infringement claims as to both the '745 Patent and the '175 Patent . (Docket No. 18 - Counts I and II). The indirect infringement claims are for contributory infringement and inducement to infringe. *Id.* "Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement...." *Dynacore Holdings Corp.,* 363 F.3d at 1272. Title 35 U.S.C.A. § 271 relates to infringement of patents and provides, in pertinent part, as follows:

> a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.
>
> (b) Whoever actively induces infringement of a patent shall be liable as an infringer.
>
> (c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C.A. § 271. Thus, to prove contributory infringement pursuant to §271(c), a patent holder must demonstrate the following: 1) that the alleged infringer made and sold the alleged infringing product; 2) the alleged infringing product has no substantial non-infringing uses; 3) that the alleged infringer made sales within the

United States that contributed to another's direct infringement; and 4) direct infringement. *DSU Medical Corp. v. JMS Co., Ltd.,* 471 F.3d 1293, 1303 (Fed. Cir. 2006). To prove inducement to infringe under §271(b), "a patent holder must prove that once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.' However, 'knowledge of the acts alleged to constitute infringement' is not enough. The 'mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.'" *Id.* at 1305 (citations omitted). As with contributory infringement, to prove inducement to infringe a patent holder must also prove direct infringement. *Dynacore Holdings Corp.,* 363 F.3d at 1272.

I will now apply this law to the patents at issue in this case.

a. '745 Patent - Count I

Defendants first argue that there can be neither contributory infringement or induced infringement because there is no direct infringement. (Docket No. 183, pp. 9-14). To begin with, there are three types of accused probes: 1.5 mm, 2.3 mm, and 3.2 mm. A "patentee always has the burden to show direct infringement for each instance of indirect infringement." *DSU Medical Corp. v. JMS Co., Ltd.,* 471 F.3d 1293, 1303 (Fed. Cir. 2006). After a review of the evidence, I agree with Defendants that ERBE has failed to produce or cite to any evidence of anyone ever using an accused 1.5 mm probe or a 3.2 mm probe. *See,* Docket No. 211. Thus, there is no genuine issue of material fact that the accused 1.5 mm probes and its 3.2 mm probes did not directly infringe on the '745 Patent. *DSU Medical Corp,* 471 F.3d at

1305.  Accordingly, summary judgment in favor of Defendants is warranted with regard to Count I as it relates to Defendants' 1.5 mm probes and 3.2 mm probes.

The other accused probes at issue are the Canady 2.3 mm probes.  To that end, Defendants submit that their 2.3 mm probes do not infringe the '745 Patent because they are used at flow rates greater than 1 l/min and flow velocities greater than 19 km/hr.  (Docket No. 183, pp. 9-14).  Based in part on the prosecution history, I construed the term "less than about 1 liter/minute" to mean "less than 1 liter/minute" and the term "low flow rate" to mean a rate of flow of less than about 1 liter/minute and producing flow velocities less than 19 km/hour such that the gas exiting through the distal end opening forms a non laminar inert gas atmosphere.  (Docket No. 112, p. 18-21).  Accordingly, based on the rationale set forth in the claims construction opinion, I find that when any probe is used with an ERBE APC system with a flow rate of 1 l/min or greater or has  flow veocities of 19 km/hour or greater, there can be no direct infringement of the '745 Patent.  (Docket No. 112).    W i t h regard to the flow velocities of  less than 19 km/hour, ERBE cites to the rebuttal report of its expert, Steven Wereley.  (Docket No. 211, p. 14-15, citing ERBE Ex. 10, pp. 4-5 at Docket No. 207-13).  While he suggests the calculations used by Defendants' expert are incorrect, Mr. Wereley does not provide any testimony with regard to what the flow velocities are, let alone, that they are less than 19 km/hour.  *Id.*; *see also,* ERBE Ex. 30 at Docket No. 207-32.  Thus, after a review of the record, I find that ERBE has failed to produce direct evidence that the flow velocities of the accused 2.3 mm probes were less than 19 km/hour.  *See,* Docket No. 211, pp. 14-15.  Without

such evidence, ERBE cannot meet its burden of proving that the accused 2.3 mm probes directly infringed on the '745 Patent. Thus, there is no genuine issue of material fact that the accused 2.3 mm probes did not directly infringe on the '745 Patent. *DSU Medical Corp,* 471 F.3d at 1305. Accordingly, summary judgment in favor of Defendants is warranted with regard to Count I as it relates to Defendants' 2.3 mm probes.

Even if I did not find this to be the case, summary judgment would still be warranted as to ERBE's contributory infringement because ERBE has failed to demonstrate a genuine issue of material fact that the accused 2.3 mm probes have no substantial non-infringing uses. Specifically, Defendants argue that ERBE has failed to meet its burden of proving that there are no substantial non-infringing uses on the accused probes. (Docket No. 183, pp. 11-12; Docket No. 217, pp. 2-3). In support of the same, Defendants produced the depositions of Dr. Gostout of the Mayo Clinic and Dr. Al-Kawas of Georgetown University Hospital who testified that they use flow rates higher than 1 l/min when using the accused probes. (Docket No. 179-28, pp. 11-12; Docket No. 196-5, pp. 11-12). In addition, they have produced a chart which indicates all of their sales. (Docket No. 27, pp. 12-24, Ex. A).

In response, ERBE argues that this evidence does not amount to "a substantial non-infringing use" because they are not a "qualitatively significant noninfringing use" since they have produced evidence from Dr. Vargo of the Cleveland Clinic who testified that when he begins all of his APC procedures, he sets the argon flow rate at 0.8 and then adjusts the flow rate up or down to achieve the desired effect.

(Docket No. 211, p. 15, citing Ex. 22 at Docket No. 207-24). I am not persuaded by ERBE's argument. The affidavit of Dr. Vargo merely shows that one doctor has used the probes in a potentially infringing manner.[14] The issue, however, is not whether the accused probes have been used in an infringing manner, but whether the accused probes have a substantial non-infringing use. *DSU Medical Corp,* 471 F.3d at 1303.

According to the evidence submitted, Dr. Gostout and Dr. Al-Kawas have used 650 of the accused probes at flow rates at 1 l/min or higher, while Dr. Vargo has used 160 of the accused probes below 1 l/min. Based on this evidence, the accused probe is used 80% of the time in a non infringing manner. It is unreasonable to consider an 80% noninfrining usage as an occasional aberrant use of the accused probes. To the contrary, I find this evidence to be a qualitatively significant noninfringing use.

Consequently, I find that there is no genuine issue of material fact that the accused 2.3 mm probes have substantial non-infringing uses. Accordingly, the claim of contributory infringement contained in Count I cannot stand for this reason as well.

b. '175 Patent - Count II

Defendants argue that they are entitled to summary judgment as to Count II of the Amended Complaint alleging infringement of the '175 Patent because: 1) their accused probe does not contain a pencil; and 2) their accused probe does not

---

[14]There is no evidence from Dr. Vargo regarding the flow velocity.

have a "plurality of individual passageways."[15]  (Docket No. 183, p. 14; Docket No. 217, p. 4-5).   In response, ConMed acknowledges that this court construed Claim 1 to require a pencil and "all equivalents of that" pencil.   (Docket No. 200, pp. 5-6).  ConMed argues, however, that based on Mr. Walbrink's interpretation of the claims the pencil structure should not properly be included in Claim 1.   Additionally, ConMed argues, based on Mr. Walbrink's interpretation of the claims, that the "plurality of passageways" structure should not be included in Claim 1.  To that end, ConMed requests that I revise my claim construction decision accordingly.  (Docket No. 200, p. 6).  I decline to do so.

ConMed next argues that there is a genuine issue of material fact that the accused probes contain a structure that satisfies the requirement of a "pencil or its equivalent."  (Docket No. 200, pp. 6-10).  In support of its position, ConMed supplies the expert declaration of Harold J. Walbrink.  (Docket No. 200, pp. 6-10, *citing,* Expert Report of Dr. Walbrink at Docket No. 204, ¶7(e)-(f)).   Based on the same and viewing it in the light most favorable to the non-moving party, I find there is a genuine issue of material fact on this issue.  Therefore, summary judgment is not warranted on this basis.

ConMed further argues that there is a genuine issue of material fact that the accused probes have a structure that satisfies the requirement of a "flexible cord with a plurality of individual passageways.  (Docket No. 200, pp. 11-14).  In support of

---

[15]In their Reply Brief, Defendants argue in two sentences that summary judgment is warranted because ConMed fails to satisfy its burden of proving no substantial non-infringing uses.  (Docket No. 217, p. 5).  I refuse to consider such a fleeting argument not made in their original Motion or Brief and for which ConMed had no opportunity to respond.  (Docket Nos. 182 and 183).

its position, ConMed once again relies on the expert declaration of Mr. Walbrink. (Docket No. 200, pp. 11-14, *citing,* Expert Report of Dr. Walbrink at Docket No. 204, ¶7(c)).   Based on the same and viewing it in the light most favorable to the non-moving party, I find there is a genuine issue of material fact on this issue as well. Therefore, summary judgment is not warranted on this basis.

Consequently, summary judgment as to Count II of Plaintiffs' Complaint is denied

2.  <u>Count III - Federal Trademark Infringement of US. Trademark Reg. No. 2,637,603 ("'630 Registration") under the Lanham Act AND Count IV - Unfair Competition in Violation of 15 U.S.C. §1125 (Trade Dress)</u>[16]

Defendants argue that they are entitled to summary judgment as to the '630 trademark (Count III) and trade dress (Count IV) claims  because they are invalid and that Defendants do not infringe upon them.  (Docket No. 183, pp. 14-2).  The '630 trademark is not registered on the Primary Register, but rather is registered on the Supplemental  Register.    (Docket  No.  211,  p.  19;  Docket  No.  179-13  -  Ex.  12). Furthermore, the trade dress is unregistered.  (Docket No. 211, p. 19).   The parties agree that the elements necessary to prove both ERBE's trademark infringement claim and ERBE's trade dress claim are virtually the same.  (Docket No. 183, pp. 14-24; Docket No. 211, pp. 8-9, 19-24).  Specifically, ERBE must prove that the Blue Probe mark and its trade dress are non-functional, that they are inherently distinctive or

---

[16] 'Trade dress' refers to the design or packaging of a product which serves to identify the product's source."  *Shire US Inc. v. Barr Laboratories, Inc.*, 329 F.3d 348, 353 (3d Cir. 2003).

have acquired inherent distinctiveness through secondary meaning,[17] and that there is a likelihood of confusion.  *See, Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159 (1995); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*  529 U.S. 205, 210-11 (2000); *Shire US Inc. v. Barr Laboratories, Inc.,* 329 F.3d 348, 353 (3d Cir. 2003); *Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1439 (3d Cir. 1994); *see also,* Docket No. 183, p. 15.  Defendants argue that ERBE cannot prove any of the elements.  (Docket No. 183, pp. 15-24).

With regard to the first element, the Supreme Court has explained that "'[i]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage."  *Qualitex Co.,*  514 U.S. at 165, *quoting Inwood Lab oratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850, n. 10 (1982).  "The Restatement (Third) of Unfair Competition adds that, if a design's 'aesthetic value' lies in its ability to 'confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs,' then the design is 'functional.' Restatement (Third) of Unfair Competition § 17, Comment c, pp. 175-176 (1993). The 'ultimate test of aesthetic functionality,' it explains, 'is whether the recognition of trademark rights would significantly hinder competition.' Id., at 176." *Qualitex Co.,*  514 U.S. at 170.

---

[17]ERBE does not argue that the blue probe trademark or trade dress is inherently distinctive. *See,* Docket No. 211.  Rather, ERBE relies on the proposition that the Blue Probe mark and trade dress have acquired inherent distinctiveness (secondary meaning).

Defendants argue that the color blue is functional for surgical procedures in that blue enhances endoscopic identification. *See,* CT Ex. 14 at Docket No. 179-15 (stating that "[b]lue color enhances positive Endoscopic identification"). Furthermore, Defendants submit that the only other competitor is ConMed and it probes are blue in color. *See,* CT Ex. 21 at Docket No. 179-22. Specifically, with regard to the trade dress, Defendants submit that the black markings are, "by ERBE's own binding admission, functional." (Docket No. 183, p. 24). As support Defendants point to the patent wherein it states:

> As may be seen from FIGS. 22 and 23, the distal end portion of tube 2 protruding from the end of the working channel 7 of the endoscope 1 may be provided with markings 50, 51, 52. An arrangement of such ring shaped markings allows to observe, how far tube 2 protrudes out of the distal end of the working channel 7 of the endoscope.

CT. Ex. 2 (Docket No. 179-3, p. 21).

In opposition, ERBE argues that the blue color of its probes is not essential to their use or propose. (Docket No. 211, p. 19). In support of this position, ERBE only submits the declaration of Christian Erbe who declares that "[b]lue is one of many colors available for APC Probes. Any color, other than beige or red, would be clearly visible during endoscopic procedures." (Docket No. 211, p. 20, *citing,* Ex. 25, ¶24 at Docket No. 207-27). Based on the same, ERBE concludes that the color blue is not "uniquely superior." (Docket No. 211, p. 20). The Third Circuit has held, however, that "merely because there are other shapes and designs ' which defendant could use and still produce a workable' product, the design used is not thereby non-

functional." *Keene Corp. v. Paraflex Indus., Inc.,* 653 F.2d 822, 827 (3d Cir. 1981). ERBE does not submit any argument that the black markings are non-functional. (Docket No. 211, p. 19). Thus, viewing the evidence in the light most favorable to ERBE, I find there is no genuine regarding the issue that the blue color of its APC probes or that the black markings are non-functional. Consequently, summary judgment in favor of Defendants as to ERBE's trademark (Count III) and trade dress claims (Count IV) is warranted on this ground.

Even if there was a genuine issue as to whether the blue color and the black markings were found to be non-functional, summary judgment as to ERBE's trademark (Count III) and trade dress claims (Count IV) would still be warranted because there is no genuine issue of material fact as to whether the trademark and trade dress have acquired secondary meaning. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 (1982), *citing, Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118 (1938); *Duraco Prods., Inc.,* 40 F.3d at 1440.

> Factors relevant to a finding of secondary meaning in a product configuration include: (1) plaintiff's advertising expenditures, measured primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature, *see First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir.1987); (2) consumer surveys linking the distinctive product configuration to a particular, single source (although the identity of the source need not be known); and (3) length and exclusivity of use. Consumer surveys and testimony

> are probably the only direct evidence of secondary
> meaning; the other sources are circumstantial, though the
> plaintiff may rely solely on them.

*Duraco Products, Inc.*, 40 F.3d at 1452.

Defendants argue that ERBE cannot prove that the blue probe trademark and trade dress have acquired secondary meaning. (Docket No. 183, pp. 19-21). Specifically, Defendants submit that: 1) there is no evidence to conclude that the color blue identifies ERBE as the supplier of flexible endoscopic tubing; 2) the probes of the other competitor, ConMed, are blue; 3) there is very little advertising evidence regarding the color blue; 4) there are no surveys; and 5) the length of use of the color blue has been 8 ½  years, which is a short time in the world of trademarks. (Docket No. 183, p. 20-21). Additionally, with regard to the trade dress, Defendants assert that ConMed's probes have a plurality of graduated black markings as well. (Docket No. 183, p. 24; *see,* CT Ex. 21).

In response, ERBE submits that its blue probe mark and trade dress have acquired secondary meaning. (Docket No. 211, pp. 21-22). ERBE argues that it can prove that the blue probe trademark and trade dress have acquired secondary meaning because it has been using the color blue for over 30 years on its medical equipment and its has promoted the Blue Probe mark in various marketing materials including brochures, giveaways and through the use of the tagline "TRUE BLUE PROBE FOR ARGON PLASMA COAGULATION." (Docket No. 211, pp. 21-22). ERBE does not submit any specific evidence with regard to the black markings. *Id.*

After a review of the evidence, however, I find that ERBE has failed to come

forward with sufficient evidence to create a genuine issue of material fact with regard to the issue of whether the blue probe trademark and trade dress have acquired secondary meaning. Specifically, I find that while ERBE may have been using the color blue for over 30 years, there is no evidence that, in the minds of the public, the primary significance of the color blue is to identify ERBE as the source of the product rather than the probes. *Inwood, supra.* Furthermore, while ERBE concludes that it has promoted the Blue Probe mark in various marketing materials, ERBE has failed to provide any evidence of the marketed materials or the related expenditures. Furthermore, ERBE has failed to supply any surveys or customer testimony regarding the same. Finally, as Defendants point out, ConMed, the other competitor, uses blue tubing on its probes. Thus, I find that there is no genuine issue regarding secondary meaning. Consequently, summary judgment in favor of Defendants as to ERBE's trademark (Count III) and trade dress claims (Count IV) is warranted on this ground as well.[18]

Counts V and VI are titled Common Law Infringement and Unfair Competition and Common Law Passing Off. (Docket No. 18). "The test for common law trademark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act." *Tillery v. Leonard & Sciolla, LLP,* 437 F.Supp.2d 312, 328 (E.D.Pa. 2006), *citing, Fisons Horticulture, Inc. v.*

---

[18]Since I have found that summary judgment as to Counts III and IV is warranted based on functionality and secondary meaning, I need not consider the arguments regarding likelihood of confusion. Furthermore, since I have granted summary judgment in favor of Defendants as to ERBE's trademark claim, I need not address Defendants' argument regarding whether Defendants' alleged use of the ERBE trademark in comparing the prices of its products to ERBE's products is lawful. (Docket No. 183, pp. 25-26).

*Vigoro Indus.*, 30 F.3d 466, 472 (3d Cir.1994). Since I have found that summary judgment is warranted as to Counts III and IV, summary judgment is similarly warranted as to Counts V and VI.

**\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \***

## ORDER OF COURT

AND NOW, this **18ᵗʰ** day of December, 2007, after careful consideration of the submissions of the parties and for the reasons set forth in the accompanying Opinion it is ordered as follows:

1. ConMed's Motion to Strike (Docket No. 142) is denied.

2. ConMed's Motion for Partial Summary Judgment (Docket No. 114) is granted in part and denied in part as follows:

    a. Counterclaim Six is dismissed against ConMed and its Motion for Partial Summary Judgment as to Counterclaim Six is denied as moot;

    b. ConMed's Motion is granted as to Counterclaims Five, Seven, and Eight, and, as such, summary judgment is entered in favor of ConMed as to the same; and

    c. ConMed's Motion is denied as to Counterclaim Nine.

3. ERBE's Motion for Partial Summary Judgment (Docket No. 137) is granted in part and denied in part as follows:

    a. ERBE's Motion is denied as to Counterclaim Four; and

    b. ERBE's Motion is granted as to Counterclaims Five, Six and Seven.

4. Defendants' Motion for Summary Judgment (Docket No. 182) is granted in part and denied in part as follows:

a.   Defendants' Motion is granted as to Counts I, III-VI of the Amended Complaint; and

b.   Defendants' Motion is denied as to Count II of the Amended Complaint.

It is further Ordered that a settlement/pre-trial conference is scheduled for Tuesday, January 8, 2008, at 10:30 A.M. before the undersigned on the Third Floor, Suite 3280 of the U.S. Post Office & Courthouse. Counsel are to have settlement authority and parties are to be either present or available by telephone. Position letters are to be faxed to Chief Judge Ambrose three (3) days prior to the conference.

BY THE COURT:

/S/   Donetta W. Ambrose

Donetta W. Ambrose,
Chief U. S. District Judge